No. 3188

Second Circuit

FRANKLIN ET AL. v. LOUISIANA & ARKANSAS RY. CO.

(March 12, 1929. Opinion and Decree.)
(April 5, 1929. Rehearing Refused.)

L. K. and R. D. Watkins, of Minden, attorneys for plaintiffs, appellants.

White, Holloman and White, of Alexandria, and A. L. Burford, of Texarkana, Ark., attorneys for defendant, appellee.

ODOM, J. This is a damage suit brought by Mrs. Canary Franklin, widow, for herself individually, and as tutrix of her minor child, Bernice Franklin, for the killing of her husband and father of her child by one of defendant's trains at a crossing about one mile north of Sarepta, in Webster Parish, Louisiana.

The acts of negligence which plaintiffs charge against defendant are that the train was being operated at an excessive rate of speed, without any warning signals; and that the train crew saw or could have seen the automobile as it approached the track or when it was in close proximity thereto in ample time to avoid the accident, if proper and usual precautions had been observed.

She further alleged that the automobile in which the deceased was riding was stopped and that the driver looked and listened before going on the track; and, in the alternative, that if it should be held that the driver of the car was negligent, his negligence should not be imputed to her deceased husband, who was a guest in the car.

Defendant denied every act of negligence charged and set up that the accident was due solely to the fault and negligence of the driver of the automobile. The District Judge found for defendant, rejected plaintiff's demands, and she has appealed.

## OPINION.

As a rule in cases of this kind, the testimony on the pertinent issues is conflicting. But this case is an exception to the rule. Counsel for plaintiff, in their efforts to make out their case, had not the assistance of such witnesses as are usually relied upon to make out cases of this kind for the reason that not only plaintiff's husband, but the other two occupants of the car as well, were killed at the crossing.

On a misty, rainy day in January, 1927, plaintiff's husband and two other men, named King, were going home from their work in a Ford touring car, with all the curtains up, except the front curtain on the driver's side. Young King was driving, with his father by his side, and plaintiff's husband occupied the rear seat. They were proceeding north along a public highway, on the east side of the railroad track, which highway parallels the track to a point approximately one mile north of the station at Sarepta, where it turns to the left, or west, and crosses. At the same time, one of defendant's passenger trains was coming south. The automobile and the train reached the crossing at the same time, with the result that the car was wrecked, and the occupants all killed.

It is very probable, we think, that none of the occupants of the car saw the train. If the driver of the automobile did not see the train approaching, it was because he did not look, for the testimony makes it clear that if he had looked, he could have seen. If he looked and saw the train approaching and tried to run across the track ahead of it, he was worse than negligent; he was reckless. The automobile was moving at a speed of something like 25 or 30 miles an hour, and it is asserted by many witnesses, and denied by none, that the driver did not even slacken his speed, much less stop, before going upon the crossing.

But his negligence cannot be imputed to plaintiff's husband who was on the back seat and was not responsible for the operation of the car, and there is no room for holding that he himself was guilty of any negligence in failing to warn or caution the driver.

Churchill vs. T. & P. Ry. Company, 151 La. 726, 92 So. 314; Daull vs. New Orleans Ry. & Light Company, 147 La. 1012, 86 So. 477; Peterson vs. New Orleans Ry. & Light Company, 142 La. 835, 77 So. 647; Vitale vs. Checker Cab Company, Inc., 166 La. 527, 117 So. 579 (decided May 7, 1928).

We must, therefore, determine whether there was negligence on the part of the defendant. If there was, plaintiff should recover, otherwise, she can not.

The crossing is not in a village, town or city, but in the open country about a mile north of the town of Sarepta. Some of the witnesses mention two or three residences nearby, and it is said that there was considerable travel on the public highway. But there is no testimony tending to show that the crossing is in a thickly settled, populous community. It is an ordinary crossing. There is no law or regulation requiring trains to stop or slow down, or requiring those in charge of them to exercise extraordinary care or vigilence at such crossings. All that is required is that reasonable or ordinary care and caution be observed.

"At ordinary crossings, it is the duty of the railroad company to keep a lookout, to run at a reasonable rate of speed and to give timely warning of the approach of engines or trains." 22 R. C. L. 989.

Under Act 12 of 1924, page 16, those in charge of trains

"shall cause the bell to be rung or the whistle to be blown at a distance at least 300 yards from the place where the railroad crosses over any highway or municipal street, and the bell shall be kept ringing or the whistle shall be kept blowing continuously until said crossing is passed."

Now, the undisputed facts are that both the fireman and the engineer on this occasion were looking ahead, watching the track and the right-of-way; that this was a passenger train running 30 or 35 miles an hour, which was not excessive; and that the whistle was blown twice before reaching the crossing, once when the train was 1300 feet, and again, when it was 600 feet from the crossing; and that the bell was ringing continuously. The conclusion that the whistle was blown and the bell rung is not based solely upon the testimony of the train crew. Mrs. Tyler, a disinterested witness, was in an automobile with some friends, traveling south on the highway in the direction in which the train was going. She says that she and the other occupants of the car all heard the whistle about the time they passed the church, which is more than 1300 feet from the crossing, and that immediately her friend, Mrs. Pool, remarked that the train was coming and told her brother, who was driving the car, that there was a crossing ahead and cautioned him to be careful. She says the bell was ringing. Mrs. Knight, who was also in the car, tells the same story, except that she did not notice the bell. Mrs. Pool was not called because she was sick at the time and her brother was with her in the sanitarium. Louis Neeley was a passenger on the train. He says the whistle blew and he got up from his seat and remarked to a friend that he must soon get off.

The automobile went upon the crossing from the fireman's side. He says he saw the car when it was 60 or 70 feet from the crossing, and that the train was about the same distance. It is manifest that a collision was inevitable unless the automobile stopped, for the train could not be stopped or even checked in time to avert it. If it was running 30 miles an hour, it was moving 44 feet per second, and if 35 miles, 51 1-3 feet per second. The fireman says that the moment he saw that the car would not stop, the brakes were applied. We must assume that a small fraction of time elapsed between the moment he determined to act and when he got his hand on the brake lever and pulled it so as to set them, and some small fraction of a second for the brakes to take effect after the air was applied. So that very likely the brakes did not take effect until the crossing was reached.

But counsel argue that by using diligence, the fireman could have seen the car before it got so close, and that it was his duty to watch the highway for approaching cars and to prepare in advance for an emergency which might arise in case the car failed to check its speed or stop.

There is no law or rule which requires those in charge of trains to watch the highways in rural and sparsely populated districts for approaching vehicles or pedestrians, and to anticipate that they will not use precautions for their own safety and protection. But the rule is the other way. The "stop, look and listen" rule is so firmly established in the jurisprudence of this country that it has now become a "standard of conduct." The train has the right of way. When a motorist or pedestrian approaches a railroad track,

"he knows he must stop for the train, not the train stop for him." Baltimore & Ohio R. Co. vs. Dora Goodman, Adm'x (C. C. A.) 10 Fed. 2d Ed., 58.

This being the rule, or "standard of conduct," it follows necessarily that the train crew has a right to assume that those approaching railroad crossings will observe the rules.

"Even where a person is seen approaching the crossing, the Company owes him the same duty that it owes to the public in general,—that is, reasonable diligence and care to avoid injury. In such cases the engineer is not bound to stop the train; he may act on the supposition that the traveler will stop before reaching the the track." 22 R. C. L., Sec. 218 p. 991.

In Nelson et al. vs. Texas & Pacific Railway Co., 140 La. 676, 73 So. 769, the court held, to quote the syllabus:

"Railroad trainmen have a right to assume that a person standing on or near the track can see and hear, and will get out of the way on receiving the usual signal warnings." Wells vs. Morgan's La. & Texas Ry. & S. S. Co., 147 La. 58, 84 So. 493.

While the train crew may assume that one approaching the track will observe the ordinary rules, of caution, yet, if it is apparent, or if with the exercise of reasonable diligence it should be apparent that such person is unaware of danger and will not stop, it becomes their duty to use such precautions to stop or check the train in order to avert the accident, as are consistent with the safety of the train and the passengers. Otherwise, the company will be liable under the last clear chance doctrine. Counsel cite the cases of:

Jones vs. Mackay Tel. Cable Co. et al., 137 La. 121, 68 So. 379; Blackburn vs. Louisiana Ry. & Nav. Co., 144 La. 520, 80 So. 708; Jones vs. Chicago, Rock Island & P. R. Co., 4 La. App. 457 (affirmed by Supreme Court in 162 La. 690, 111 So. 62). But the rule announced in those cases finds no application here.

In the first of the above cited cases, it was admitted that the handcar on the track could have been seen from a distance of 4000 feet. In the second case, the deceased was drunk on the track and was negligent in going there. But the court found that if the engine had been equipped with proper headlights, the crew could have seen him, if they had exercised due diligence, in time to save him. In each case the company was held liable under the last clear chance doctrine.

In the Jones vs. Chicago, Rock Island, etc., case, the deceased was lying on the track, drunk and motionless, on the outskirts of the City of Ruston, where the engineer knew that many pedestrians used the track as a footpath. The engineer saw the object on the track in time to stop before reaching it, but did not know what it was until 60 feet from it, and then it was too late to stop. The court held that the engineer, under the circumstances, should have applied the brakes as soon as he saw the object.

There is no room for the application of the last clear chance doctrine in the case at bar, because, after seeing the car approaching the crossing 60 feet away, it was not then physically possible to stop or to even check the speed of the train in time to avert the collision.

Counsel argue that this was a dangerous crossing and that, therefore, the train crew should have taken extra precautions, for

"The precautions to be adopted and the steps to be taken in aid of safety increase as the danger of accident and injury increases." Jones vs. Chicago, Rock Island & P. R. Co., 4 La. App. 457 (464).

But this is not a dangerous crossing. It is in the country, and the view of the track is not obstructed, except by some trees, the nearest of which is 62 feet from

the track. There is a curve in the track, but that is over 900 feet above the crossing.

The train was going 30 to 35 miles an hour. As stated, this is not excessive. In Davis vs. Alexandria & Western Ry. Co., 152 La. 898, 94 So. 436; it was held that in open country, outside of city limits, any speed is legitimate for a railroad train which is consistent with the safety of such train.

For the reasons assigned, the judgment appealed from is affirmed, with costs in both courts.